## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMMY KIDD**,

        Plaintiff,

vs.                                    No. **04-CV-1355 MCA/ACT**

**CITY OF ALBUQUERQUE, NEW MEXICO,**

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class* [Doc. 139], filed June 29, 2007, and Plaintiff's *Supplemental Motion and Memorandum for Final Class Certification* [Doc. 140], also filed June 29, 2007.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants in part and denies in part *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class* and grants Plaintiff's *Supplemental Motion and Memorandum for Final Class Certification*.

## I. BACKGROUND

The relevant facts of this matter are set out in the Court's March 31, 2006 *Memorandum Opinion and Order* [see Doc. 111] and will be restated here only as they are necessary to an understanding of both the currently pending motions and the procedural posture of the case.

Plaintiff Sammy Kidd is a former employee of the City of Albuquerque ("the City") who began working for the City as a student aide in 1987. In 1994, Mr. Kidd secured a position as a temporary recreation leader with the City and began working in its boxing program. By 1995, Mr. Kidd was running the Northside Boxing Club Program, working just under 40 hours per week and also acting as community center manager. The Northside program closed in 1999 and Mr. Kidd moved on to the Barelas Community Center's boxing program where he worked as a recreation leader and boxing trainer until Barelas closed in 2001. In 2001, Mr. Kidd transferred to the Jack Candelaria Community Center where he worked as a boxing trainer and supervisor of the boxing program. [Doc. 128 at 2-3].

It is undisputed that Mr. Kidd worked for the City for 12 months each year over a continuous period of more than 10 years. [Doc. 128 at 3; Doc. 131 at 2]. Still, he was, since 1994, considered and paid as an unclassified "temporary" or "seasonal" employee. [Doc. 128 at 3].

On July 26, 2004, Mr. Kidd received a memo from Patricia D. Miller, the City's Director of Human Resources, notifying him of his termination, effective August 6, 2004. On August 16, 2004, Mr. Kidd, through counsel, requested that then-Chief Administrative Officer ("CAO") James Lewis set aside the termination and reclassify him as a permanent employee. Alternatively, counsel asked that the matter be set for a hearing in accordance with the applicable section of the City's Merit System Ordinance. Neither occurred. [Doc. 128 at 4-5].

On October 20, 2004, Mr. Kidd filed his five-count *Complaint* against the City, Mayor

2

Martin Chavez, CAO Lewis, and Director of Department and Family Community Services Valorie Vigil.  [See Doc. 1, Exh. A].  In his *Complaint*, Mr. Kidd alleged that: (a) the City breached the employment contract that arose from the terms of its Merit System Ordinance ("the MSO") and its Personnel Rules and Regulations ("the PRR")   (Count 1); (b) Defendants violated Mr. Kidd's right to procedural due process by terminating him without an opportunity to be heard (Count 2); (c) he was wrongfully terminated (Count 3); (d) Defendants violated the Fair Labor Standards Act by failing to compensate him for after-hours and weekend work (Count 4); and (e) Mr. Kidd was entitled to, among other things, injunctive or extraordinary relief in the form of a hearing and  reinstatement to a permanent, classified position (Count 5). [Id. at 7-8].

Both sides then moved for summary judgment. [See Docs. 41, 42].  Additionally, Mr. Kidd sought certification of a class of all persons employed or previously employed by the City and allegedly erroneously labeled and treated as temporary or seasonal workers.[1]  [See Doc. 46].  Once this Court disposed of the summary-judgment motions, the sole remaining defendant was the City, and the only count that remained was Count 2, the procedural due process claim.   [See Doc. 111].  In its *Order* disposing of the initial summary-judgment motions, this Court concluded that, at that point in the proceedings, it was not possible to determine as a matter of law that, given the totality of the circumstances, Mr. Kidd's original

---

[1]  In a separate *Order* also entered March 31, 2006, the Court conditionally certified a class of plaintiffs, pending a more definitive determination of the scope and members of that proposed class. [See Doc. 112 at 13].

3

at-will employment relationship[2] with the City had *not* been modified, such that he might have been able to assert a legitimate claim of entitlement to continued employment. [See Doc. 111 at 11-12].

Following this Court's March 31, 2006 rulings, Mr. Kidd moved to amend his *Complaint* to incorporate class action claims; dismiss the individual defendants; and modify the claims, causes of action, and relief requested. [See generally Doc. 119].  The Court granted the motion, and on February 15, 2007, Mr. Kidd filed his *First Amended Class Action Complaint for Denial of Constitutional Rights and Declaratory Judgment* ("the *First Amended Complaint*") [Doc. 128].  In the *First Amended Complaint*, Mr. Kidd reasserts his due process claim and newly asserts a claim for the denial of equal protection.  He also seeks a declaratory judgment "that the City's practices in employing long-term 'temporary' or 'seasonal' or contract employees and denying them the compensation, rights, benefits and permanent 'classified' employee status of similarly situated 'classified' employees violates the law and the rights of Plaintiffs." [Id. at 10].

On June 29, 2007, the City filed its currently pending supplemental motion for summary judgment and motion to decertify the class. [Doc. 139].  The City maintains that (1) Mr. Kidd's due process claim fails because there is no factual or legal support for his assertion that he had a protected property interest in his position as a temporary or seasonal City employee; (2) Mr. Kidd's equal protection claim fails because the City had a rational

---

[2]  The City agrees that its MSO and PRR created a contract with Mr. Kidd, but maintains that that contract specifically reconfirmed the at-will nature of the relationship. [See Doc. 49 at 10].

basis for treating members of its classified service differently from members of its unclassified service; and (3) declaratory relief is not appropriate where the underlying claims cannot be supported. [See generally Doc. 138]. The City also asks the Court to reconsider its conditional class certification on grounds that (1) there will be no class representative if Mr. Kidd's claims are dismissed, and (2) in the event the asserted claims are allowed to move forward, the class-action requirements of commonality and typicality will be negated given the fact-specific nature of each potential class member's claims. [Id. at 17-21].

## II. ANALYSIS

### A. Standard of Review

### 1. Fed.R.Civ.P. 56(c)

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. See id. at 248. Judgment is appropriate as a matter of law if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

5

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S. at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998).  "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence;  conclusory and self-serving affidavits are not sufficient.'"  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotation omitted).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

## B. *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class*

### 1. The Procedural Due Process Claim

Mr. Kidd contends that he had a protected property interest in his employment because he had an objectively reasonable expectation of continued employment based on the City's actions.  Those actions include the City's ignoring its own definitions of "temporary" and "seasonal" employees by (1) failing to give fixed dates of termination to employees hired as temporary workers and retaining them after two years, and (2) knowingly retaining employees hired as seasonal workers after they had exceeded nine months of employment in any year. [Doc. 149 at 9-11].

The City's MSO divides city employees into two groups—members of the classified service and members of the unclassified service.   Section 3-1-6, "The Classified and Unclassified Service," provides, in pertinent part, that

> (A) All employees in the city service shall be divided into unclassified service and classified service.
> . . .
> (B) The classified service shall be comprised of all employees except those who are specifically placed in the unclassified service.
> (C) The unclassified service shall be comprised of the following:
> . . .
>        (5) Temporary and seasonal employees *employed as such*;
> . . .
> (D) Unclassified employees are employees at will and serve at the discretion of the Chief Administrative Officer . . . . Such employees shall have no property interest in continued unclassified employment and may be dismissed for any or no reason.

[Doc. 43; Exh. C at § 3-1-6 (emphasis added)].  The City's PRR goes on to define temporary and seasonal employees:

306.3 <u>Temporary Employees</u>

> A temporary employee is one who is given a termination date at the time of appointment and whose length of service may not exceed two (2) years.  Temporary employees shall be terminated two (2) years from the date of hire.  Temporary employees are not entitled to any of the rights and benefits under these rules and regulations except for PERA membership.

306.4 <u>Seasonal Employee</u>

> A seasonal employee is one who is hired to work no

7

> more than nine (9) months in a twelve (12) consecutive
> month period.  Seasonal employees are not entitled to
> any of the rights and benefits of employment to which
> other employees are entitled under these rules and
> regulations.

[Id.; Exh. C at §§ 306.3 and 306.4].

"'The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.'" Darr v. Town of Telluride, Colo., 495 F.3d 1243, 1251 (10th Cir. 2007) (*quoting* Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972)). When the state seeks to terminate a protected property interest, the right to notice and opportunity for a hearing usually are paramount. Darr, 495 F.3d at 1251.  "Although these demands of due process are often relatively clear, the question of whether an employee has a protected interest in employment is less so."  Id. Importantly, property interests are not created by the Constitution; they are created and their dimensions defined by existing rules or understandings that stem from independent sources, "such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Roth, 408 U.S. at 577.  To create a property interest, the state-law rule or understanding must give the recipient a legitimate claim of entitlement to the benefit.  For example, an employee may possess a property interest in public employment if he has tenure, a contract for a fixed term, an implied promise of continued employment, or if state law allows dismissal only for cause or its equivalent.  Darr, 495 F.3d at 1251.

While New Mexico follows the general rule that employment is terminable at will by either the employee or the employer absent an express contract to the contrary, an exception

8

to this rule holds that the existence of an implied contract limits the employer's authority to discharge. <u>Gormley v. Coca-Cola Enter.</u>, 135 N.M. 128, 134 (N.M.App. 2003) (*citing* <u>Lopez v. Kline</u>, 134 N.M. 539, 541 (N.M. App. 1997)). Whether such an implied contract, modifying the at-will employment relationship, exists is generally a fact question, requiring the fact-finder to examine the totality of circumstances surrounding the employment relationship in considering whether the employer made a promise modifying that relationship. <u>Gormley</u>, 135 N.M. at 134. "An implied contract may be found in written or oral representations, *in the conduct of the parties*, or in a combination of representations and conduct." <u>Id.</u> (emphasis added) (*citing* <u>Newberry v. Allied Stores, Inc.</u>, 108 N.M. 424, 427-428 (1989)).

When it ruled on the original summary-judgment motions, this Court was

> unable to say as a matter of law that no implied contract existed between Kidd and the City, such that the original at-will employment relationship was modified. This determination is based on the language of the MSO and the PRR, as well as the actions of the City. The PRR defines a temporary employee as "one who is given a termination date at the time of appointment and whose length of service may not exceed two (2) years." [Doc. 43, Exh. C at § 306.3]. The PRR also states that "[t]emporary employees *shall* be terminated two (2) years from the date of hire." [Id. (emphasis added)]. For its part, the MSO includes as members of the unclassified service "[t]emporary and seasonal employees *employed as such*." [Doc. 43, Exh. C at § 3-1-6(C)(5) (emphasis added)]. In light of the fact that he was employed by the City for more than ten years, the Court cannot say as a matter of law that Kidd, who was initially hired as a temporary employee, was actually "employed as such" at the time of his termination. The "employed as such" language, the City's own mandate that temporary employees' tenure not exceed two years, and the fact that Kidd was kept on with the

> City for more than ten years constitute the types of statements
> and actions that create a question of fact as to whether there
> existed an implied contract sufficient to modify Kidd's original
> at-will employment status. See Newberry, 773 P.2d at 1234.

[Doc. 111 at 7-8]. The Court further noted that, in his affidavit, Mr. Kidd's stepfather, "Tony

Castro represent[ed] that, on two separate occasions, City personnel informed him that

certain temporary employees might be considered permanent." [Id. at 22].   The Court

expressly concluded that "[s]uch an allegation b[ore] on the issue of whether Kidd's initial

at-will employment relationship with the City was at some point modified, which, in turn,

[was] relevant to the claim in Count Two that Kidd was denied benefits and protections

extended to permanent City employees." [Id. at 22-23].

Since the Court's March 31, 2006 rulings, Tony Castro has been deposed. [See Doc.

138; Exh. C, May 11, 2007 depo. of Tony Castro].  In his deposition, Mr. Castro confirmed

that no City representative to whom he spoke—including then-CAO Lewis—promised to

make Mr. Kidd a permanent employee. [Id. at 11-12].   Mr. Castro confirmed that he

understood Mr. Kidd to be employed in a temporary position, and that Mr. Kidd was aware

that his position was temporary. [Id. at 14].  Mr. Castro also confirmed that, notwithstanding

the conversation he had with then-CAO Lewis, during which Mr. Lewis suggested that

certain temporary employees should be considered and made permanent employees, Mr.

Kidd was never notified that he had been made a permanent City employee.  [Id. at 16].

Mr. Kidd similarly testified through his deposition that he was never promised a

promotion or any particular job or position. [Doc. 138; Exh. B, May 11, 2007 depo. of

Sammy Kidd at 24, 26, 29, 38-39].   To the contrary, he testified that he was told by supervisors and others that he needed to bid and/or apply for positions in which he might be interested.   [Id. at 26, 29].  Mr. Kidd did not remember anyone ever telling him that his position would be made permanent, nor could he remember being told that, so long as he continued to do his job well, he would remain employed. [Id. at 20, 33-34].  Mr. Kidd also explained that the reason he did not "go over the chain of command" when he believed he was receiving the "runaround" when his supervisor left (thus creating a vacancy) is that "[s]ince [he] was a part-time employee, they could have gotten rid of [him] at any time." [Id. at 27].  Given the deposition testimony of both Mr. Castro and Mr. Kidd, it is apparent that Mr. Kidd was never promised a permanent City position.

In New Mexico, however, an implied contract may be found not just in written or oral representations, but also in the conduct of the parties.  See Newberry, 108 N.M. at 427-428; see also Jones v. University of Cent. Oklahoma, 13 F.3d 361 (10th Cir. 1993) (emphasizing the importance of looking to state contract law to determine whether a litigant can establish an entitlement or a contract right to certain property because of mutually explicit understandings inferred from the parties' conduct, statements, or practices).  Notwithstanding the lack of any evidence of written or oral representations of permanent employment, both Mr. Kidd and Mr. Castro testified as to Mr. Kidd's continued employment despite the City's having told him that he would receive a break in service every two years. [Doc. 138; Exh. B; Kidd depo. at 42-43; Exh. C, Castro depo. at 28].  When Mr. Kidd was asked whether he recalled being told that he would be fired or let go after two years, the following colloquy

11

took place:

> A:   That, I remember.
> Q:   You do remember that?
> A:   Yeah.
> Q:   And when did that happen? Did that happen after you worked for the City for two years?
> A:   Yes.
> Q:   And did they fire you?
> A:   Nope.
> Q:   Why not?
> A:   I don't—I don't know.
> Q:   So did they tell you that every two years? Did they say, We're going to fire you after two years?
> A:   Yeah, break in service.
> Q:   Now, who told you that?
> A:   Every—pretty much every supervisor I worked for.  We would have to take a break in service every two years.
> Q:   Every supervisor would have to take a break in service?
> A:   No, every supervisor—
> Q:   Would tell you that you would have to take a break in service?
> A:   [Yes].

[Id.; Exh. B, Kidd depo. at 41-42].  Mr. Kidd also stated that "every two years, they would tell me that they were going to let me go and bring me back, but that never happened." [Id. at 43].

Mr. Castro was asked similar questions:

> Q:   Did anyone ever tell [Mr. Kidd] when he would be fired, that you were aware of? Did he ever come and tell you, "Somebody told me I'm going to be fired on July 31, 2000?"
> A:   Yes, he did.  He did come say that, "They're saying that they're going to have to fire me," which never happened.
> Q:   And did he ever tell you that right at the time or did you know that at the time he was hired?
> A:   At the time that it was going to—supposedly was

> supposed to happen, he would come home and tell me
> that they had told him that he was going to be fired
> because he was over his time, and that's it.  It never
> happened.
>
> Q:   Did that happen after more than the first two years?
> A:   Yes.

[Doc. 138; Exh. C, Castro depo. at 28].[3]

The City distills Mr. Kidd's argument to be that "by virtue of his longevity, he was no longer an unclassified employee.  According to [Mr. Kidd's] argument, after expiration of the two year period stated in the rules for temporary employees or the nine of twelve months for seasonal employees, [he] became a permanent, classified employee." [Doc. 138 at 12].  If simple longevity were the sole factor supporting Mr. Kidd's argument, however, this Court would be far more inclined to accept the City's argument for, as the City points out, continued employment, with nothing more, is not enough to create a property interest. [See Doc. 138 at 10 (*quoting* Roberts v. Ward, 468 F.3d 963, 969-970 (6th Cir. 2006); see also Kiedrowski v. Citizens Bank, 119 N.M. 572, 576 (N.M.App. 1995) (indefinite retention alone is not sufficient to "imply a contractual obligation to continue that practice.")].  But the Court is not convinced that longevity, in and of itself, is what drives Mr. Kidd's argument.

Instead, the Court returns to the concern it identified in its March 31, 2006 *Memorandum Opinion and Order*, to wit: what does it mean to be a temporary or seasonal

---

[3] It is not entirely clear how the City's "break in service" policy was actually applied to Mr. Kidd.  According to DFCS Division Manager Paula Ramsey, City records show that Mr. Kidd had a break in service between August 8, 1998 and September 8, 1998. [Doc. 138; Exh. E, June 21, 2007 Affidavit of Paula Ramsey at 2].  No such records, however, have yet been made a part of the record.  According to Mr. Kidd, he "always got a paycheck, even one time [the City] tried to do a break in service [he] still got paid for it." [Id.; Exh. B, Sammy Kidd depo. at 28].

13

employee "*employed as such*"? [See Doc. 111 at 7-8, 12].

As previously explained, the terms of the City's MSO include as members of the unclassified service "[t]emporary and seasonal employees employed as such . . . ." [Doc. 43; Exh. C at §3-1-6(C)(5)].  For its part, the PRR defines a temporary employee as one who is given a termination date at the time of appointment, with the mandate that temporary employees "*shall* be terminated two (2) years from the date of hire[;"] and a seasonal employee as one who is hired to work no more than 9 of 12 consecutive months. [Id. at § 306.3 and 306.4].  Mr. Kidd remained in the City's employ for ten years without a break in service.  More than simply remaining beyond the expiration of the two-year period specified in the PRR, as the City frames the issue, Mr. Kidd, who worked for the City from 1994 until 2004, would have experienced as many as *five* two-year period expirations.  Additionally, Mr. Kidd was retained despite having been informed by "pretty much every supervisor [he] worked for" that he would be required to take the breaks in service that never materialized.

Moreover, rather than clarify the issue, the supplemental pleadings have raised additional questions as to what it meant—at least insofar as Mr. Kidd is concerned— to have been a temporary or seasonal employee "employed as such."  For example, in her affidavit, DFCS Division Manager Paula Ramsey explained that:

> [t]emporary and seasonal workers were not intended to have the same responsibilities as permanent employees.  Temporary and seasonal workers in the Department of Family and Community Services were responsible for supervising patrons, mainly children, who made use of city recreation centers and for

14

> implementing programs which were developed by permanent
> staff.
> . . .
> Temporary and seasonal employees were and are intended to be
> college and high school age employees who did not want or
> need full time work.

[Doc. 138; Exh. E, Ramsey affidavit].

Through his deposition, however, Mr. Kidd testified to "running [his] own facility."

[Doc. 138; Exh. B, Sammy Kidd depo. at 11].  He also explained that, while with the

Northside Boxing Club Program, he (1) completed payroll; (2) filled out weekly and monthly

reports; and (3) was provided with keys to the center. [Id. at 14].  This testimony tends to

suggest that over the course of his tenure with the City, Mr. Kidd may have been entrusted

with greater responsibilities than those described by Ms. Ramsey and intended for employees

who truly were employed as temporary and/or seasonal workers.  In short, the question that

was raised in the Court's March 31, 2006 *Memorandum Opinion and Order*—whether, under

the circumstances, Mr. Kidd was a temporary employee employed as such at the time of his

termination and, if not, whether he should have been considered a member of the City's

classified service—persists.  For that reason, summary judgment with respect to Mr. Kidd's

procedural due process claim must again be denied.

## 2. The Equal Protection Claim

For his equal protection claim, Mr. Kidd asserts that

> Plaintiffs are similarly situated with City employees filling
> classified positions; Defendant's continued misclassification of
> Plaintiffs as unclassified "temporary" or "seasonal" employees
> has resulted in the differential treatment of the similarly situated

> Plaintiffs. This differential treatment is the City's failure to
> provide wages, benefits, and rights to the unclassified Plaintiffs
> that are accorded to those who are considered "classified."

[Doc. 128 at 9]. The parties agree that the City's classification scheme is subject to "rational basis" review. [See Doc. 138 at 14 ("[T]he city's distinction between classified and unclassified employees must only satisfy the rational basis test[.]") and Doc. 149 at 17 ("The City correctly asserts that the distinction between classified and unclassified employees performing the same work with vastly different pay, benefits, and rights does not implicate any fundamental rights. As such, the City's scheme that subjected Sammy Kidd and the similarly situated plaintiffs to second-class status is subject only to 'rational basis' review.")].

Just as it protects against the denial of due process, "[t]he Fourteenth Amendment also prohibits a state from denying 'any person within its jurisdiction the equal protection of the laws.'" U.S. Const. amend. XIV, § 1.  Under the "rational basis" test referred to above, the Court must uphold the challenged policy "if there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Spragens v. Shalala, 36 F.3d 947, 950 n.3 (10th Cir. 1994) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)).

"[W]hen legislative judgment is called into question on equal protection grounds and the issue is debatable, the decision of the legislature must be upheld if 'any state of facts either known or which could reasonably be assumed affords support for it.'" Powers v. Harris, 379 F.3d 1208, 1216-17 (10th Cir. 2004) (quoting United States v. Carolene Products Co., 304 U.S. 144, 154 (1938)).  Judicial second-guessing is prohibited, as is speculation by

the Court "as to whether some other scheme could have better regulated the evils in question." Powers, 379 F.3d at 1217. Finally, a policy will not be struck down because (1) it does not succeed in bringing about the contemplated result; (2) its classifications lack razor-sharp precision; or (3) no empirical evidence supports the assumptions underlying the legislative choice. Id. The party attacking the rationality of the legislative classification has the burden "to negative every conceivable basis which might support it[.]" Beach Commc'ns, Inc., 508 U.S. at 315 (*quoting* Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)).

In this case, the City contends that the reason it treats its classified employees differently from unclassified employees (such as temporary and seasonal workers) is that it "needs groups of employees with the flexibility to work schedules other than the usual work day, and to work fluctuating numbers of hours depending on the specific needs of the organization." [Doc. 138 at 14-15].  As examples, the City cites (1) lifeguards, who work during the summer season but need not remain employed after pools close; and (2) workers in its summer recreation program, who are largely students and teachers who similarly work during the summer but return to school at the season's end.  As the City points out, "[t]here is no financial justification for enrolling these short term employees in benefit and retirement programs which would simply be cancelled or deactivated at the conclusion of the assignment." [Id. at 15].

Mr. Kidd has not "negative[d the City's] conceivable basis" for its classification system.  See Powers, 379 F.3d at 1217.  In fact, a close reading of Mr. Kidd's *Response*

17

reveals that it is not the policy itself to which he objects, but the City's alleged disregard of its own decision to hire temporary and seasonal employees and to employ them "as such." [See Doc. 149 at 17-18 ("The same rational basis that supports the City's rules and ordinance limiting the service and defining the status of 'temporary' and 'seasonal' employees demonstrates the *irrationality and unfairness of the administration's actions* setting aside those legislative enactments . . . . *[T]he City administration's failure to comply with those definitional limits is what violates the equal protection clause.*" (emphasis added)].  Because the City has articulated a legitimate justification for its classification system, which Mr. Kidd has not negated, summary judgment will be entered for the City with respect to Mr. Kidd's equal protection claim.

### 3. The Request for Declaratory Judgment

In his request for declaratory relief, Mr. Kidd asks this Court to "[i]ssue a declaratory ruling holding that the City's practices in employing long-term 'temporary' or 'seasonal' or contract employees and denying them the compensation, rights, benefits and permanent 'classified' employee status of similarly situated 'classified' employees violates the law and the rights of Plaintiffs." [Doc. 128 at 10].  The City maintains that declaratory relief is inappropriate because, among other things, there exists no underlying meritorious claim. [Doc. 138 at 16].

"The Declaratory Judgment Act does not extend the jurisdiction of federal courts; it only 'enlarge[s] the range of remedies available.'" Prier v. Steed, 456 F.3d 1209, 1212 (10th Cir. 2006) (*quoting* Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950).

Power to issue declaratory judgments must lie in some independent basis of jurisdiction. Prier, 456 F.3d at 1212.  Importantly, actions invoking the Declaratory Judgment Act must comport with the same mootness principles as any other suit.  Id. at 1213.

To the extent that Mr. Kidd seeks a declaration that the City treats similarly situated employees differently, [see Doc. 128 at 10], the dispute is moot in light of the Court's entry of summary judgment for the City on the equal protection claim.  The declaration that Mr. Kidd seeks would have no legal effect in the absence of a viable claim for the denial of equal protection.  See Prier, 456 F.3d at 1213 ("The crucial question is whether granting a present determination of the issues offered . . . will have some effect in the real world." (internal citations and quotations omitted)).  Accordingly, summary judgment will be entered for the City with respect to Mr. Kidd's request for declaratory relief.

### C. *Supplemental Motion and Memorandum for Final Class Certification*

In its March 31, 2006 certification *Order*, this Court

> conditionally certified . . . a class of former seasonal and temporary [City] employees, pending a more definitive determination of the scope of the proposed class, to include the relevant time frame of employment, and whether the class members are representative of only the City's DFCS, or whether the class members are to be representative of numerous other City departments.[4]

[Doc. 112 at 12-13].  Mr. Kidd now seeks final certification of a class of former "temporary"

---

4  Mr. Kidd had originally proposed a class including employees from the City's Parks and Recreation, Cultural Affairs, Solid Waste Management, and Corrections and Detention Departments, in addition to DFCS employees. [See Doc. 32 at 2].  He continues to suggest that the class should not be limited to DFCS employees. [See Doc. 155 at 12].

City employees who worked for more than two years without a fixed date of termination and former "seasonal" City employees who worked more than nine months per year. [See generally Doc. 140].  The City has asked the Court to reconsider its conditional class certification, arguing, in part, that factual inquiries will need to be made into the particular circumstances of each class member's employment relationship with the City, thus negating the commonality and typicality requirements of Rule 23(a). In the alternative, the City asks that a class be certified as to Count 2 only.  [Doc. 138 at 17-21].

A district court may certify a class only if, after rigorous analysis, it determines that the proposed class satisfies the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure. J.B. v. Valdez, 186 F.3d 1280, 1287-88 (10th Cir. 1999). Those prerequisites are:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Id. at 1288 (quoting Fed.R.Civ.P. 23(a)).  This Court conducted such a rigorous analysis and, for reasons set forth in its March 31, 2006 certification Order, concluded that the four prerequisites to class certification had been met. [See generally Doc. 112].

In its contemporaneously entered Order ruling on the parties' motions for summary judgment, the Court narrowed the issue  presented to the following: whether Mr. Kidd's original at-will employment relationship with the City was modified such that he should properly have been considered a member of the City's classified service, as opposed to a

member of its unclassified service. [See Doc. 111 at 12].  In so determining, the Court looked to (1) the language of those sections of the PRR that define "temporary" and "seasonal" employees; (2) that part of the MSO providing that the unclassified service includes temporary and seasonal employees "employed as such;" (3) Mr. Kidd's ten-year term of employment; and (4) possible statements or promises of permanent employment that allegedly were made to Mr. Kidd's stepfather, Tony Castro. [Id. at 7-8, 22-23]. Supplemental briefing has assisted in further narrowing the issue inasmuch as it is now apparent that Mr. Kidd was never promised permanent employment, either directly or by virtue of conversations between his stepfather and City representatives.  Therefore, at least with respect to Mr. Kidd, whether his at-will employment relationship with the City was modified will not require the fact-finder to consider and assess promises or assurances of permanent employment; instead, various aspects of the City's conduct, as well as the meaning of the "employed as such" language, will be paramount.

Nevertheless, whether an at-will employment relationship has been modified is a question requiring the fact-finder to examine the totality of circumstances, including (1) conduct; (2) promises or representations, and (3) a combination of conduct and promises or representations.  Thus, while promises or representations may not factor into the consideration with respect to any modification of Mr. Kidd's employment relationship with the City, they may very well be an issue with respect to potential class members.  To determine whether promises or representations of permanent employment were made to each potential member would require the fact-finder to inquire into the specific employment

relationship of each such member vis-à-vis the City.  The parties estimate the potential class to number approximately 240.  [See Doc. 159 at 2 (discovery-order hearing at which "temporary" class members were estimated to be "in the range of 35 to 40 employees" and "seasonal" class members were estimated to "number[] a little more than 200.")].  The City believes that this fact-specific inquiry negates the commonality and typicality requirements; it is on this basis that the City asks the Court to reconsider its initial class certification.

This Court has considered the City's request and understands the City's concern. However, "'[t]hat the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" J.B., 186 F.3d at 1288 (quoting Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir.1988)).  This is because subsection (b)(2), upon which this Court relied in its March 31, certification Order, does not require that common questions of law or fact predominate.  See Adamson, 855 F.2d at 676.  The existence of predominant common legal or factual questions is, instead, a requirement of subsection (b)(3); all that is required to maintain a class action pursuant to (b)(2) is that, in addition to the prerequisites of subsection (a) having been met, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ."  Fed.R.Civ.P. 23(b)(2); see also .

In this case, Mr. Kidd alleges that he and many other City employees who were hired as "temporary" or "seasonal" employees were not truly "employed as such" and, in light of the City's conduct, developed a reasonable expectation in continued employment; as a

consequence, Mr. Kidd maintains, he and the City employees he seeks to represent were entitled to certain due process protections upon termination.   The requirements of commonality and typicality continue to be satisfied because Mr. Kidd alleges a systemic wrong, inasmuch as he charges the City with violating city-wide policies respecting "temporary" and "seasonal" workers who were not truly "employed as such."

The remaining question, then, is who is properly included as a member of this class, and how is this class defined? Mr. Kidd contends that

> [t]he class is properly identified as former-employees employed by the city as longterm ["temporary" employees working more than two years and/or without a fixed date of termination and "seasonal" employees employed for more than nine months per year] temporary and/or seasonal employees. The appropriate time for inclusion in the class is a three-year period prior to the date of filing of the Motion for Class Certification, i.e., July 18, 2002 to the present. (Doc. 32; filed July 18, 2005). American Pipe and Construction Co. v. Utah, 414 U.S. 538, 554 (1974).

[Doc. 140 at 13].  The Court agrees that a three-year time frame is appropriate, given New Mexico's three-year statute of limitations for civil rights actions.   Compare Garcia v. Lemaster, 439 F.3d 1215, 1217 n.3 (10th Cir. 2006) (citing N.M. STAT. ANN. § 37-1-8 (1978)) ("Actions must be brought . . . for an injury to the person or reputation of any person, within three years.") and American Pipe & Const. Co. v. Utah, 414 U.S. 538, 554 (1974) (holding that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.").  Accordingly, the Court defines the class in this matter as follows:

(1) former "temporary" employees of the City of Albuquerque who were not given termination dates at the time of appointment and whose length of service exceeded two (2) years; and

(2) former "seasonal" employees of the City of Albuquerque who worked more than nine (9) months in a twelve (12) consecutive month period; and

whose alleged injury (*i.e.*, termination without process) occurred within the three-year period preceding the filing of Mr. Kidd's motion for class certification (*i.e.*, not earlier than July 18, 2002).

## III. CONCLUSION

For the reasons stated herein, *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class* [Doc. 139] will be granted in part and denied in part. Plaintiff's *Supplemental Motion and Memorandum for Final Class Certification* [Doc. 140] will be granted.

**IT IS, THEREFORE, ORDERED** that *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class* [Doc. 139] is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class* [Doc. 139] is **GRANTED** as to Mr. Kidd's claim for the denial of equal protection, as asserted in Count I of the *First Amended Complaint*;

**IT IS FURTHER ORDERED** that *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class* [Doc. 139] is **DENIED** as to Mr. Kidd's claim for the denial of procedural due process, as asserted in Count I of the *First Amended Complaint*

**IT IS FURTHER ORDERED** that *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class* [Doc. 139] is **GRANTED** as to Count II of the *First Amended Complaint*;

**IT IS FURTHER ORDERED** that Plaintiff's *Supplemental Motion and Memorandum for Final Class Certification* [Doc. 140] is **GRANTED**;

**IT IS FURTHER ORDERED** that a class consisting of the following be and hereby is certified pursuant to Fed.R.Civ.P. 23(b)(2):

> (1) former "temporary" employees of the City of Albuquerque who were not given termination dates at the time of appointment and whose length of service exceeded two (2) years; and

> (2) former "seasonal" employees of the City of Albuquerque who worked more than nine (9) months in a twelve (12) consecutive month period; and

> whose alleged injury (*i.e.*, termination without process) occurred within the three-year period preceding the filing of Mr. Kidd's motion for class certification (*i.e.*, not earlier than July 18, 2002).

**SO ORDERED** this 29th day of February, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

25