IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**SAMMY KIDD**,

       Plaintiff,

   vs.                           No. 04cv1355 MCA/ACT

**CITY OF ALBUQUERQUE, NEW MEXICO,**

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court (1) *sua sponte*, following the parties' submission of additional briefing, which was done at the direction of the Court; (2) on *Plaintiffs' Motion for Definite Trial Setting* [Doc. 187], filed November 11, 2008; and (3) on the City of Albuquerque's *Motion to Strike Plaintiffs' "Reply" on Motion for Definite Trial Setting* [Doc. 190], filed March 3, 2009. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court makes the following rulings, as set forth below.

## I. BACKGROUND

The relevant facts of this matter are set out in the Court's March 31, 2006 *Memorandum Opinion and Order* [see Doc. 111] and will be restated here only as they are necessary to an understanding of the current procedural posture of the case.

Plaintiff Sammy Kidd is a former employee of the City of Albuquerque ("the City") who began working for the City as a student aide in 1987. In 1994, Mr. Kidd secured a

position as a temporary recreation leader with the City and began working in its boxing program.  By 1995, Mr. Kidd was running the Northside Boxing Club Program, working just under 40 hours per week and also acting as community center manager.  The Northside program closed in 1999 and Mr. Kidd moved on to the Barelas Community Center's boxing program where he worked as a recreation leader and boxing trainer until Barelas closed in 2001.  In 2001, Mr. Kidd transferred to the Jack Candelaria Community Center where he worked as a boxing trainer and supervisor of the boxing program.  [Doc. 128 at 2-3].

It is undisputed that Mr. Kidd worked for the City for 12 months each year over a continuous period of more than 10 years. [Doc. 128 at 3; Doc. 131 at 2].  Still, he was, since 1994, considered and paid as an unclassified "temporary"or "seasonal" employee. [Doc. 128 at 3].

On July 26, 2004, Mr. Kidd received a memo from the City's Director of Human Resources, notifying him of his termination, effective August 6, 2004.  On August 16, 2004, Mr. Kidd, through counsel, requested that the City's Chief Administrative Officer set aside the termination and reclassify him as a permanent employee.  Alternatively, counsel asked that the matter be set for a hearing in accordance with the applicable section of the City's Merit System Ordinance.  Neither occurred.   [Doc. 128 at 4-5].

On October 20, 2004, Mr. Kidd filed his *Complaint* against the City and individual City employees, alleging (1) breach of the employment contract that arose from the terms of the City's Merit System Ordinance ("the MSO") and its Personnel Rules and Regulations ("the PRR"); (2) violation of his right to procedural due process as a result of being

terminated without an opportunity to be heard; (3) wrongful termination; and (4) violation of the Fair Labor Standards Act.  Mr. Kidd sought, among other things, injunctive or extraordinary relief in the form of a hearing, and reinstatement to a permanent, classified position.  [See Doc. 1, Exh. A].

Both sides then moved for summary judgment. [See Docs. 41, 42].  Additionally, Mr. Kidd sought certification of a class of all persons employed or previously employed by the City and allegedly erroneously labeled and treated as temporary or seasonal workers.  [See Doc. 46].  Once this Court disposed of the summary-judgment motions, the sole remaining defendant was the City, and the only count that remained was the procedural due process claim set forth in Count 2 of the *Complaint*.   [See Doc. 111].  In its March 31, 2006 *Order* disposing of the initial summary-judgment motions, this Court concluded that, at that point in the proceedings, it was not possible to determine as a matter of law that, given the totality of the circumstances, Mr. Kidd's original at-will employment relationship with the City had *not* been modified, such that he might have been able to assert a legitimate claim of entitlement to continued employment.[1] [See Doc. 111 at 11-12].  Among other things, the Court questioned what it means to be a temporary or seasonal employee "employed as such"for purposes of the MSO's inclusion of such workers as members of the unclassified service. [Id. at 7].

---

[1]  The City agrees that its MSO and PRR created a contract with Mr. Kidd, but maintains that that contract specifically reconfirmed the at-will nature of the relationship. [See Doc. 49 at 10].

In a separate *Order* also entered March 31, 2006, the Court conditionally certified a class of plaintiffs, pending a more definitive determination of the scope and members of that proposed class. [See Doc. 112 at 13].

Following this Court's March 31, 2006 rulings, Mr. Kidd moved to amend his *Complaint* to incorporate class action claims; dismiss the individual defendants; and modify the claims, causes of action, and relief requested. [See generally Doc. 119]. The Court granted the motion, and on February 15, 2007, Mr. Kidd filed his *First Amended Class Action Complaint for Denial of Constitutional Rights and Declaratory Judgment* ("the *First Amended Complaint*") [Doc. 128]. In the *First Amended Complaint*, Mr. Kidd reasserted his due process claim and newly asserted a claim for the denial of equal protection. He also sought a declaratory judgment "that the City's practices in employing long-term 'temporary' or 'seasonal' or contract employees and denying them the compensation, rights, benefits and permanent 'classified' employee status of similarly situated 'classified' employees violates the law and the rights of Plaintiffs." [Id. at 10].

On February 20, 2007, Magistrate Judge Alan C. Torgerson set new discovery and dispositive-motions deadlines. [See unnumbered dkt. entry of 2/20/07]. The City then filed *Defendant's Supplemental Motion for Summary Judgment and Motion to Decertify Class*, and Mr. Kidd filed his *Supplemental Motion and Memorandum for Final Class Certification*. [See Docs. 139, 140]. By *Memorandum Opinion and Order* entered February 29, 2008, this Court granted in part and denied in part the City's motion, and granted Mr. Kidd's motion. With respect to the City's motion, the Court concluded that entry of summary judgment in

favor of the City was appropriate as to Mr. Kidd's equal-protection claim and his request for declaratory relief. [See Doc. 168 at 15-19].  As for the procedural due process claim, the Court "return[ed] to the concern it identified in its March 31, 2006 *Memorandum Opinion and Order*, to wit: what does it mean to be a temporary or seasonal employee '*employed as such*'?" [Doc. 168 at 13-14].  The Court also noted that, given affidavit and deposition testimony that had been submitted with the supplemental summary-judgment motions, "rather than clarify the issue, the supplemental pleadings . . . raised additional questions as to what it meant—at least insofar as Mr. Kidd is concerned— to have been a temporary or seasonal employee 'employed as such.'" [Id. at 15].

Thereafter, by *Order* entered May 6, 2008, the Court directed the parties to meet and confer regarding the status of the case, and to submit a Joint Status Report to the Court on or before May 27, 2008. [Doc. 173].  Pursuant to a deadline extension, the parties submitted a Joint Status Report on July 9, 2008.  In that report, the parties represented that

> there remain[ed] outstanding issues regarding the class composition and settlement[, with] Plaintiffs' position [being] that identification of the names of the individual class members [was] not a necessary prerequisite to settlement or trial [and] the City's position [being] that the individual class members [might] each have a separate claim which [might] not be readily susceptible to class consideration.

[Doc. 181 at 1].

At a status conference held July 18, 2008, counsel for the City stated that "the City would like to settle the case[,]" but to do that, the City required clarification on certain issues. Counsel explained:

> [T]here [are] two issues that I would like to brief for the Court[, with] number one [being] the composition of the class[. A]nd the only issue that I would like to brief for the Court with the composition of the class is break-in-service[,] because that's where we broke down in identifying the class—on what length of break in service should be included in the class composition. . . .
>
> The second [issue] is what relief is actually available to the class members.

[Transcript of July 18, 2008 status conference (rough draft) at 9:43:40 to 9:44:38].  The Court then ordered simultaneous briefing on the issues of (1) the break-in-service length that would allow inclusion in the class; and (2) available remedies. [Id. at 9:45:38 to 9:46:04; see also Doc. 182 at 2].  Those issues are now fully briefed. [See Docs. 185, 186].

## II. ANALYSIS

### A.    The Parties' Briefs on Class Composition and Available Remedies

#### 1.    Class Composition

In its *Memorandum Opinion and Order* of February 29, 2008, the Court defined the class to be certified in this matter as follows:

> (1) former "temporary" employees of the City of Albuquerque who were not given termination dates at the time of appointment and whose length of service exceeded two (2) years; and
>
> (2) former "seasonal" employees of the City of Albuquerque who worked more than nine (9) months in a twelve (12) consecutive month period; and
>
> whose alleged injury (*i.e.*, termination without process) occurred within the three-year period preceding the filing of Mr. Kidd's motion for class certification (*i.e.*, not earlier than July 18, 2002).

6

However, as explained by counsel for the City on July 18, 2008, identification of the class "broke down" with respect to the question of "what length of break in service should be included in the class composition." [Tr. 9:43:40 to 9:44:00].

The City suggests that a putative class member's break in service should be determined by whether that employee did or did not receive a paycheck. The City says that

> [a]s to temporary employees, if any employee did not receive a paycheck, that employee did not work and had a break in service. The passage of an entire pay period without earnings is a rational and consistent indicator of a break in service. This use of payroll records is the most reliable method of accurately establishing whether an employee had a break in service. This information can be retrieved electronically without hand searching each individual employee's employment history.

[Doc. 185 at 5]. The City says that the same methodology should be used with regard to seasonal employees, explaining that its

> list of seasonal employees contains individuals who worked nine consecutive months in any twelve month period. If an employee did not receive a paycheck that means the employee did not work at all during that pay period. There then exists a break in service and the break in service occurred when the months were no longer consecutive.

[Id. at 6]. Consequently, the City proposes the following definition of the class:

> The class will consist of all temporary employees continuously employed for more than any two year period, without missing a paycheck, whose employment terminated at any time after July 18, 2002. The class will include any seasonal employee employed for more than nine consecutive months in the preced[ing] 12 month period, without missing a paycheck, whose employment ended at any time after July 18, 2002.

[Id.].

7

The Court believes that an appropriate starting point for the analysis is the language of the Merit System Ordinance itself.  Section 306.3 of the MSO defines a "temporary employee" as

> one who is given a termination date at the time of appointment and whose length of service may not exceed two (2) years. Temporary employees shall be terminated two (2) years from the date of hire.  Temporary employees are not entitled to any of the rights and benefits under these rules and regulations except for PERA membership.

[Doc. 43; attached 2/1/2001 Merit System Ordinance, § 306.3].  Section 306.4 defines a "seasonal employee" as "one who is hired to work no more than nine (9) months in a twelve (12) consecutive month period.  Seasonal employees are not entitled to any of the rights and benefits of employment to which other employees are entitled under these rules and regulations." [Id., attached 2/1/2001 Merit System Ordinance, § 306.4].

The MSO does not, however, define "break in service" and, as counsel for Mr. Kidd has pointed out, the term appears usually to be used in reference to the vesting and application of pension benefits.  See, e.g., Giler v. Bd. of Trustees, 509 F.2d 848, 849 (9th Cir. 1974) (rejection of application for pension benefits from union member with 17 years worth of pension credits where there was a break in service of more than two years); Lee v. Nesbitt, 453 F.2d 1309, 1311 (9th Cir. 1972) (where term of pension plan provided that "[i]f a person does not work in Covered Employment for at least 200 days in any period of three consecutive calendar years after January 1, 1953, it shall constitute a break in employment. . . ."); Gashlin v. Prudential Ins. Co., 286 F.Supp.2d 407, 413 (D.N.J. 2003) (where policy

8

explained that "[y]ou will have a 'Break in Service' when your consecutive Break Years add up to your years of vesting service."); Tapia v. City of Albuquerque, 717 P.2d 93, 97 (N.M.App. 1986) (nine-day break in service, which was due to firefighter's resignation and subsequent reinstatement, caused loss of seniority for promotional purposes).[2]

Mendoza v. Gallup Southwestern Coal Co. is not precisely on point, but it is instructive here. In Mendoza, an injured coal miner sought compensation from his employer pursuant to the Employer's Liability Act. The parties did not dispute that the miner had been injured on the job; the sole question was the amount of compensation due, where compensation was based on average weekly earnings. Mendoza v. Gallup Southwestern Coal Co., 66 P.2d 426, 427 (N.M. 1937). Computation of the miner's average weekly earnings was complicated by the fact that he had worked for his employer for ten months before he and his co-workers "struck for higher wages and 'everybody walked out[.]'" Id. The miner worked for one week following his return after the strike, at which point the employer was paying five cents more per ton of coal than it had been paying prior to the strike. The miner was injured in the course of his employment at the end of that week. Id.

The parties' positions with respect to the amount of compensation due were explained by the New Mexico Supreme Court:

---

[2] The Court similarly has been unable to find cases or authority using the term "break in service" as the City's policies here use it. As one example, however, New Mexico's Public Employees Retirement Act, which is applicable to members of the Public Employees Retirement Association ("PERA"), states that "leave without pay for a period that exceeds twelve (12) weeks shall be deemed a break in service." N.M. ADMIN. CODE 2.80.2300.10. Interestingly, though, through § 306.3 of the MSO, the City actually offers PERA membership to temporary—though not seasonal—employees.

> [The miner] contends that the strike terminated his employment;
> that when he returned to work it was a new employment; that as
> he worked under such new employment for a full week the
> statute implies such week's earnings are the basis for measuring
> [employer's] liability. The [employer] contends that the
> "walkout" did not terminate the employment; that even if it did,
> the [miner's] average earnings should be calculated upon the
> basis of the previous year's earnings.

Mendoza, 66 P.2d at 428.  Because "a break in employment" would have prevented pre-break earnings from being taken into consideration for the purpose of determining compensation due, the question became whether the miner's employment "ceased at the time of the strike."  Id.

In answering this question, the Court evaluated the nature of the employer-employee relationship, as well as the general purpose and effects of a strike.  The Court first explained that, ordinarily, the goal of striking workers "is to secure higher wages, or shorter hours, or other like advantage, and force the employer thereby to return them to their employment with this advantage."  Mendoza, 66 P.2d at 428.  Because there is usually a time in which employer and employees confer and bargain, noted the Court,

> the employer does not always—nor even usually—accept the
> "walkout" as a complete termination of all relations between the
> parties[, although] there is a suspension of the relations of
> employer and employee.  No wages are earned by the employee
> and the employer is liable for none, and the striker is not subject
> to the orders of his former employer because of his refusal to
> work.  *When the employer loses the authority, for whatever
> cause, to direct the employee in the labor for which he was
> employed and the employee ceases to earn wages because of his
> refusing to perform labor at hand, which, under his employment
> it was his duty to perform, the relation of employer and
> employee necessarily ends.*

10

Id. (emphasis added).

Emphasizing that one of the earmarks of the employer-employee relationship is the employer's "right to direct the manner in which his business shall be done and the result to be accomplished[,]" the Court determined that

> when an employee joins other workmen in a strike he ceases at that time to be an employee. He is no longer under the direction and control of his employer in relation to the work he was employed to do, and no longer earns money as an employee, because of his refusal to work. If he returns to work, it is a new employment. . . .

Mendoza, 66 P.2d at 429.  For these reasons, the Court concluded that the strike terminated the coal miner as an employee of his employer and, therefore, pre-strike earnings should not have been considered in calculating compensation due.  Id.

This Court concludes that Mendoza is supportive of the City's position that "[t]he passage of an entire pay period without earnings is a rational and consistent indicator of a break in service[, and that] if any employee did not receive a paycheck, that employee did not work and had a break in service."  That an employee receives no paycheck indicates both that (1) "no wages are earned by the employee and the employer is liable for none[,]" and (2)  the employee "is no longer under the direction and control of his employer in relation to the work he was employed to do."  Mendoza, 66 P.2d at 428, 429.  This methodology is equally applicable to both temporary and seasonal employees.  Accordingly, the Court clarifies[3] the previously defined and certified class as follows:

---

[3]  The Court's clarifications of the class as previously certified and defined and set forth in the Court's *Memorandum Opinion and Order* of February 29, 2008 are noted in bold print.

(1) former "temporary" employees of the City of Albuquerque who were not given termination dates at the time of appointment and whose length of service exceeded two (2) years, **and who were so employed without missing a paycheck**; and

(2) former "seasonal" employees of the City of Albuquerque who worked more than nine (9) months in a twelve (12) consecutive month period, **and who were so employed without missing a paycheck**; and

whose alleged injury (*i.e.*, termination without process) occurred within the three-year period preceding the filing of Mr. Kidd's motion for class certification (*i.e.*, not earlier than July 18, 2002).

## 2.    Available Remedies

The second issue that the parties were asked to brief is that of remedies available to the class for a violation of class members' right to procedural due process.

"As a general rule, the Due Process Clause requires 'some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest[4] in his employment.'" Montgomery v. City of Ardmore, 365 F.3d 926, 935 (10th Cir. 2004) (*quoting* Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985)).  Additionally, "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978).  While damages for procedural due process violations may include damages arising from the termination of employment if there is a causal connection between the termination and the failure to provide a hearing, "if the employer can establish that the

---

[4]  Whether Mr. Kidd had a constitutionally protected property interest in City employment remains in dispute. [See Doc. 111 at 12].

employee would have been terminated even if a proper hearing had been given, the terminated employee cannot receive damages stemming from the termination in an action for a procedural due process violation." <u>Montgomery</u>, 365 F.3d at 937 (internal citations omitted).

In <u>Dargis v. Sheahan</u>, the Seventh Circuit affirmed the district court's decision to order a Merit Board hearing for a county corrections officer who, after having suffered a stroke while on duty, was placed on "zero pay status," meaning that he "remained officially in the employ of the Sheriff's Office [but] he received no pay and had no recourse to a hearing." <u>Dargis v. Sheahan</u>, 526 F.3d 981, 984 (7th Cir. 2008). That action, argued the officer, constituted a violation of his right to procedural due process. Affirming, the Seventh Circuit "conclude[d] that the district court acted appropriately in directing the Sheriff's Office to conduct a hearing instead of proceeding to trial on damages[,]" particularly where "the Merit Board could better determine whether [the officer's] placement on involuntary unpaid leave was justified." <u>Id.</u> at 989-990.

Although the instant case bears some similarities to <u>Dargis</u>, one clear difference is the fact that <u>Dargis</u> *was not* a class action. However, <u>Lightfoot v. District of Columbia</u> *was* a class action in which city employees sued the District of Columbia, alleging, *inter alia*, that the city's failure to adopt written and consistently applied standards, policies, and procedures governing the termination, suspension, and modification of their disability compensation benefits violated their procedural due process rights. <u>Lightfoot v. District of Columbia</u>, 355 F.Supp.2d 414, 418 (D.D.C. 2005). The district court granted the employees' motion for

partial summary judgment on their procedural due process claim, which voided the unpublished procedures used by the City.  Although the court remanded the matter "to the relevant District of Columbia agency for discussion, promulgation, and eventual publication[]" of the applicable rules, it also explained that

> [t]he remedy available for aggrieved parties under these circumstances is not limited to remand to the agency for rule-making.  Rather, the Court shall order that the disability compensation benefits, both cash and medical, of all members of the Plaintiff class be reinstated as of the date of this Opinion and Order until individualized termination, modification, or suspension determinations may be made under validly promulgated rules. Such an order to reinstate benefits is in line with past precedent.

[Doc. 172 in 01cv1484 CKK/JMF at 30-31, available at the U.S. District Court for the District of Columbia Electronic Document Filing System (CM-ECF)].

Denying the city's motion for reconsideration and rejecting its argument that "the only remedy available to a due process violation is nominal damages[,]" see Lightfoot, 355 F.Supp.2d at 438,[5] the court held, among other things, that its remedy was equitable and prospective, as opposed to a compensatory damages remedy, in that the remedy "un[did] the [city's] illegal acts and require[d] reinstatement of benefits as of the date of the Order, but ma[de] no finding or presumption regarding entitlement to benefits before that time."

---

[5] The city's argument was based on Carey v. Piphus, which involved students who were suspended from school without procedural due process.  The United States Supreme Court held that where a deprivation is justified but procedures are deficient, and in the absence of proof of actual injury flowing from the procedural denial, only nominal damages are recoverable.  See Carey v. Piphus, 435 U.S. 247, 266 (1978).

<u>Lightfoot</u>, 355 F.Supp.2d at 439.  Continuing with its explanation, the court emphasized that what its remedy did

> was to void the unconstitutional system and place [the employees] in the same position had the constitutional violation not occurred. Moreover, unlike the kind of set, permanent award prohibited by <u>Carey</u> and its progeny, [the city]—not the Court—ultimately determine the amount of money that must be paid to [the employees] through the speed and quality of their compliance with the Court's Opinion.

<u>Id.</u>  The court rejected the city's argument that the remedy amounted to an award of back pay to the class, inasmuch as eligible employees would "receive a flow of monies equivalent to their previous benefit stream until the [city] follow[ed] legal and constitutional requirements."  <u>Id.</u>  The court noted that even those employees who had suffered a procedural due process violation but would have lost or had their benefits reduced anyway, were nevertheless entitled to what they lost between the day their benefits were canceled or reduced and the day that would have occurred "'had [the city] followed the prescribed procedures.'" <u>Id.</u> (<i>quoting</i> <u>Patterson v. Portch</u>, 853 F.2d 1399, 1408 (7th Cir. 1988)).  Finally, the court was unpersuaded by the city's position that reinstatement was not an appropriate remedy, noting that "courts routinely have ordered reinstatement as a remedy for procedural due process in cases involving multiple plaintiffs or class actions." <u>Lightfoot</u>, 355 F.Supp.2d at 441.[6]

---

[6]  The cases to which the court was referring include:

<u>Willis v. Lascaris</u>, 499 F.Supp. 749, 760 (N.D.N.Y. 1980) (certifying class and enjoining county from continuing to reduce claimants' food stamp allotments until they were until they provided with advance notice that will complied "in all

In this case, a jury question exists as to whether Mr. Kidd's original employment contract was modified such that he should have been considered a member of the City's classified service and, thus, afforded the due process protections he was denied prior to his termination. [See Doc. 111 at 12].  If a jury were to answer this question in the affirmative, Mr. Kidd would first be entitled to notice and a hearing, which the City does not dispute. [See Doc. 185 at 3].  This matter would then be remanded to the relevant City entity for the issuance of notice and holding of a hearing.  See Dargis, 526 F.3d at 989 ("We [the Seventh Circuit] conclude that the district court acted appropriately in directing the Sheriff's Office to conduct a hearing instead of proceeding to trial on damages.").

At the same time, Mr. Kidd and the other class members would be entitled to—at the least—an award in the amount of their salary from between the day they were terminated and the day on which their dismissals would have taken effect had the City followed proper procedures.  Similar remedies were ordered by the district court in Lightfoot, where the Court ordered the reinstatement of the employees' benefit stream from the date that the

_____

respects with the Due Process Clause of the Fourteenth Amendment. . . ."); Banks v. Trainor, 525 F.2d 837, 841 (7th Cir. 1975) (in class action, affirming district court's entry of injunction preventing further reduction of claimants' food stamps until such time that claimants were provided adequate advance notice of the reasons for proposed reductions, and reinstating claimants' food stamp benefits to original benefit level); Tracy v. Salamack, 572 F.2d 393, 396 (2d Cir. 1978) (reinstating class of inmates to temporary release program from which they had been removed without a prior hearing); Febus v. Gallant, 866 F.Supp. 45, 47 (D.Mass. 1994) (certifying class and reinstating welfare benefits to claimants whose benefits were terminated through "confusing" and "inaccurate" notices from Massachusetts Department of Public Welfare that failed to "comport with the minimum requirements of constitutional due process[,]" but not requiring Department to pay back lost benefits).

16

terminations, suspensions, and reductions were identified as deficient until the earliest date

the discharges could have taken effect had proper procedures been followed.  Lightfoot, 355

F.Supp.2d at 440.  The court in Lightfoot determined this to be an appropriate remedy even

as to those employees who, in addition to having suffered a procedural due process violation,

would have lost or seen a reduction in benefits anyway.  See id. at 439.

Similar remedies have also been upheld by circuit courts.  For example, in Patterson

v. Portch, the Seventh Circuit determined that the appropriate remedy for a university

professor who had been terminated in violation of his right to procedural due process, but

who was unlikely to have prevailed had a hearing been held, was the amount of salary lost

between the day of termination and the day on which termination would have taken effect

had prescribed procedures been followed.  As that Court explained:

> it is extremely unlikely that, even if [the university chancellor]
> had followed the University's statutes to a T, [plaintiff] would
> be employed by the college today. [Chancellor] would have
> instituted a proceeding to dismiss [plaintiff] and the outcome of
> that proceeding would have been dismissal. All [plaintiff] lost
> *as a result of the constitutional violation* was his salary between
> the day that [chancellor] terminated him and the day on which
> his dismissal would have taken effect had [chancellor] followed
> the prescribed procedures. That loss . . . plus the monetary
> equivalent of any "mental and emotional distress actually ...
> caused by the denial of procedural due process itself," . . .
> —which in this case, however, might be significant—minus so
> much of the loss as might have been averted by reasonable
> efforts to mitigate damages, constitutes the damages that
> [plaintiff] would be allowed to recover from [chancellor].

Patterson v. Portch, 853 F.2d 1399, 1408 (7th Cir. 1988) (emphasis in original) (internal

citation omitted).

Similarly, in Brewer v. Chauvin, the Eighth Circuit reversed an award of back pay in the amount of $6,897 recovered by a former deputy sheriff who had been terminated without hearing, in violation of his right to procedural due process.  Repeating "the sound principle [of Carey v. Piphus] that a plaintiff must show that the complained-of wrong is the cause of his injury[,]" the Court called it

> logical[] that an employee who has a due process right to a pre-termination hearing and who is discharged without being given one would be entitled to back pay from the date of his discharge to the earliest date the discharge could have taken effect had the proper procedures been followed.

Brewer v. Chauvin, 938 F.2d 860, 864 (8th Cir. 1991).  In Brewer, however, the district court's failure to make a finding of causation required reversal and remanding, with the Eighth Circuit commenting:

> if the District Court finds that [plaintiff] would have been fired even if procedural due process had been observed, then he is not entitled to an award of back pay except for a limited award based on the earliest date he could have been fired if [proper] procedures had been followed. On the other hand, if the District Court finds that [plaintiff] was fired without proper justification, his back-pay award should be reinstated.

Id. at 865.

Lightfoot, Patterson, and Brewer persuade that, in addition to notice and a hearing, Mr. Kidd and the other class members would also be entitled to an award in the amount of their salary between the day they were terminated and the day on which their dismissals

18

would have taken effect had the City followed prescribed procedures.[7]  As a class, however,

the plaintiffs are entitled to no more, since additional remedies beyond notice, hearing, and

the monetary award discussed above would require that individual proceedings be held on

behalf of each individual class member (to determine, for example, which, if any, class

members would have been terminated notwithstanding the due process violation).

### B.     The Pending Motions

#### 1.     *Plaintiffs' Motion for Definite Trial Setting* [Doc. 187] and Defendant's *Motion to Strike Plaintiffs' "Reply" on Motion for Definite Trial Setting* [Doc. 190]

On November 11, 2008, counsel for Mr. Kidd filed a motion for a definite trial setting,

explaining, among other things, that "[a] definite trial setting now would aid the chances of

settling this case. . . ." [Doc. 187 at 5].  Although counsel represented that counsel for the

City had been contacted but opposed the motion, no response was ever filed.  Instead, on

February 10, 2009, counsel for Mr. Kidd filed *Plaintiffs' "Reply" on Motion for Definite*

*Trial Setting* [Doc. 189].  The City has moved to strike this "reply." [Doc. 190].

The Local Rules of this district provide for a motion, response, and a reply.  See

D.N.M.LR-Civ. 7.1(b).  The Rules also provide that "[t]he failure of a party to file and serve

a response in opposition to a motion within the time prescribed for doing so constitutes

consent to grant the motion."  Id.  Without a response, there was nothing to which Mr. Kidd

---

[7] This would only be the case, of course, if a jury were to determine that these plaintiffs'
original employment contracts were modified such that they should have been considered
members of the City's classified service and, thus, afforded the due process protections they
were denied prior to termination.

could reply.  Accordingly, the Court will grant the City's motion to strike Mr. Kidd's "reply."

The Court also, however, will grant in part and deny in part Mr. Kidd's motion for a definite trial setting.  The Court will not provide a definite trial setting, though the Court will, by separate Order, set the matter for trial on the Court's trailing docket.

## III. CONCLUSION

On the basis of the foregoing, the previously defined class will be clarified as further described herein, and class members will be entitled to seek the remedies set forth above. Additionally, Mr. Kidd's motion for a definite trial setting will be granted in part and denied in part, and this matter set, by separate *Order*, on the Court's trailing docket.  Finally, the City's motion to strike Mr. Kidd's "reply" will be granted.

**IT IS, THEREFORE, ORDERED** that the previously defined class in this case be and hereby is **CLARIFIED** as follows:

> (1) former "temporary" employees of the City of Albuquerque who were not given termination dates at the time of appointment and whose length of service exceeded two (2) years, **and who were so employed without missing a paycheck**; and
>
> (2) former "seasonal" employees of the City of Albuquerque who worked more than nine (9) months in a twelve (12) consecutive month period, **and who were so employed without missing a paycheck**; and
>
> whose alleged injury (*i.e.*, termination without process) occurred within the three-year period preceding the filing of Mr. Kidd's motion for class certification (*i.e.*, not earlier than July 18, 2002).

**IT IS FURTHER ORDERED** that the remedies available to the class are (1) notice; (2) a hearing; and (3) an award representing the amount of class members' salary between the day they were terminated and the day on which their dismissals would have taken effect had the City followed prescribed procedures;

**IT IS FURTHER ORDERED** that *Plaintiffs' Motion for Definite Trial Setting* [Doc. 187] is **GRANTED in PART and DENIED in PART**;

**IT IS FURTHER ORDERED** that this matter shall, by separate *Order*, be set for trial on the Court's trailing docket;

**IT IS FURTHER ORDERED** that the City of Albuquerque's *Motion to Strike Plaintiffs' "Reply" on Motion for Definite Trial Setting* [Doc. 190] is **GRANTED**;

**IT IS FURTHER ORDERED** that the Court will forthwith, by separate *Notice*, schedule a status conference with Counsel, in preparation for which the City is hereby directed to file, on or before **Thursday, April, 23, 2009**, a statement indicating the number of persons who meet the clarified class definition as set forth above.

**SO ORDERED** this 13th day of April, 2009, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

21